**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 15, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

ADEDAYO O. ADEGBOYE,

     Defendant - Appellant.

No. 12-6035

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:11-CR-00030-D-1)**

Perry W. Hudson, Oklahoma City, Oklahoma, for Defendant-Appellant Adedayo O. Adegboye.

Amanda Maxfield Green, Assistant United States Attorney (Sanford C. Coats, United States Attorney, with her on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellee United States of America.

Before **MATHESON**, **EBEL**, and **O'BRIEN**, Circuit Judges.

**EBEL**, Circuit Judge.

Following a joint trial with his Co-Defendant Olalekan Rufai, a jury convicted Defendant-Appellant Adedayo Adegboye of five counts of aiding and abetting health care fraud, in violation of 18 U.S.C. §§ 1347 and 2.  On appeal, Adegboye argues that the trial evidence was insufficient to establish, beyond a reasonable doubt, that he knowingly and willfully participated in the fraud.  Having jurisdiction under 28 U.S.C. § 1291, the panel majority affirms Adegboye's convictions.  Judge Matheson writes separately to dissent.

## I.  BACKGROUND

We incorporate the facts, procedural history, and legal background from our opinion in the related appeal of United States v. Rufai, No. 12-6034, see §§ I, II.B.

## II.  THERE WAS SUFFICIENT EVIDENCE TO SUPPORT ADEGBOYE'S CONVICTIONS

Adegboye argues that the Government failed to present sufficient evidence to prove beyond a reasonable doubt that he committed health care fraud as a principal or as an aider and abettor.  Because the Government does not contend that he is guilty as a principal, however, we focus here only on whether there was sufficient evidence to convict him for aiding and abetting health care fraud.

Adegboye acknowledges that his business associate Joshua Ohaka committed health care fraud by submitting false claims to Medicare through Adegboye's company, First Century Medical Supply ("First Century").  And Adegboye does not dispute that his acts in fact contributed to Ohaka's health care fraud generally, which would encompass

2

the incidents underlying the five substantive fraud counts charged against Adegboye. On appeal, Adegboye argues that the Government failed to present sufficient evidence from which a reasonable jury could have found, beyond a reasonable doubt, that he knowingly and willfully aided Ohaka's fraudulent scheme.

## A. Relevant legal principles

Our decision to affirm Adegboye's convictions is grounded on two legal principles. First, we review the sufficiency of the evidence to support Adegboye's convictions de novo, asking "whether a reasonable jury could find [him] guilty beyond a reasonable doubt." United States v. Anaya, --- F.3d ---, 2013 WL 4308093, at *4 (10th Cir. Aug. 16, 2013) (internal quotation marks omitted) (alterations omitted). In making this determination, we must "consider all evidence and reasonable inferences in the light most favorable to the government, and we may not weigh evidence or consider credibility of witnesses." United States v. Renteria, 720 F.3d 1245, 1253 (10th Cir. 2013). "Rather than examining the evidence in bits and pieces, we evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." United States v. Bader, 678 F.3d 858, 873 (10th Cir. 2012) (internal quotation marks omitted) (alteration omitted), cert. denied, 133 S. Ct. 355 (2012). "[T]he evidence, together with the reasonable inferences to be drawn therefrom, must be substantial, but it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." United States v. MacKay, 715 F.3d 807, 812 (10th Cir.

3

2013) (internal quotation marks omitted), <u>petition for cert. filed</u>, (U.S. Aug. 26, 2013) (No. 13-274).

Second, to obtain a conviction for aiding and abetting, the Government had to prove beyond a reasonable doubt that Adegboye "(1) willfully associated himself with [Ohaka's] criminal venture and (2) sought to make the venture succeed through some action of his own." <u>United States v. Rosalez</u>, 711 F.3d 1194, 1205 (10th Cir. 2013) (internal quotation marks omitted) (alteration omitted), <u>petitions for cert. filed</u>, (U.S. June 25, Aug. 9 and 26, 2013) (Nos. 13-5160, 13-5782, 13-6149). "[C]onduct of the defendant or special circumstances may justify the inference that the defendant associated himself with the criminal objective." <u>United States v. Burks</u>, 678 F.3d 1190, 1198 (10th Cir. 2012) (internal quotation marks omitted) (alteration omitted).

**B. There was sufficient evidence to support Adegboye's convictions for aiding and abetting Ohaka's health care fraud**

**1. Joshua Ohaka's underlying fraud**

Because the Government charged Adegboye with aiding and abetting his business associate Joshua Ohaka's health care fraud, we begin by addressing briefly Ohaka's fraudulent scheme. Ohaka's modus operandi was to create a durable medical equipment company; qualify that company as a Medicare provider; submit false claims to Medicare through that company until Medicare became suspicious and began requiring the company to submit proof of its claims; unable to present proof, Ohaka would then create

4

a new company through which to continue his fraud.[1]  Ohaka began this scheme by using

his own company, Optimed, through which he filed fraudulent Medicare claims from

2005 through approximately October 2006.  He continued the scheme with Vitacare, a

company Ohaka formed in his wife's name in 2007, and then he used his second

company, Providence, beginning in 2008.  Later, Ohaka paid Helen Etinfoh to let him use

her name to operate another company, Luant and Odera, in 2008.  This was likely due to

the fact that, by this time, Medicare had flagged for investigation any company that was

related to Ohaka.  And Ohaka continued his fraud through First Century, a company that

he formed with Defendants Adegboye and Rufai in the fall of 2007.

The false claims Ohaka filed through these companies included billing Medicare

for equipment that he never provided Medicare beneficiaries, billing Medicare for more

expensive equipment than the equipment he actually provided beneficiaries (i.e.,

providing power scooters, but billing Medicare for more expensive power wheelchairs),

and providing beneficiaries with medical equipment that was medically unnecessary and

not prescribed for the beneficiaries by their doctors, as Medicare required.  Often

Ohaka's companies would bill Medicare using the code CR (catastrophe-related), which

indicated that a Medicare beneficiary had lost previously prescribed medical equipment

during a catastrophe, such as a hurricane.  By using this code, Medicare would reimburse

---

[1] Although we refer in this opinion only to Medicare, Medicare frequently acted through
various contractors.  Those contractors, for instance, acted on Medicare's behalf to
review applications to be a Medicare provider, conduct site visits of applicants, process
and pay provider claims for reimbursement, and investigate possible fraud.

Ohaka's company for replacing the lost medical equipment without first requiring proof that a doctor had prescribed the equipment for the Medicare beneficiary.

Ohaka opened four of the five companies he used to carry out his fraud (Optimed, Vitacare, Providence and First Century) in Oklahoma, stocked them with minimal to no inventory, and hired a very few employees to man the stores and company offices. The same employees often worked for several of Ohaka's companies. The only real business these companies had was to file claims with Medicare seeking reimbursement. Ohaka carried out his fraud by, first, using "recruiters" to obtain information from Medicare beneficiaries, who usually lived in Texas or Louisiana. Then Ohaka, who lived in Texas, would send this information to his employees in Oklahoma, direct them to use that information to prepare the Medicare claim forms, his employees would do so and then, pursuant to Ohaka's instructions, send the completed claim forms either back to Ohaka or to a billing company he used to bill Medicare.[2]

---

[2] Evidence indicated that Ohaka would send "recruiters" out to take orders from real Medicare beneficiaries. Even though those beneficiaries had never been prescribed motorized scooters or wheelchairs, the "recruiters" apparently asked the beneficiaries if they wanted a scooter or wheelchair, promised to deliver one, and then obtained from the beneficiaries the information needed to file a claim for reimbursement from Medicare. Sometimes Ohaka would not provide the beneficiaries with any equipment, but still bill Medicare. Sometimes Ohaka would provide the beneficiary with a power scooter, but bill Medicare for a more expensive power wheelchair. (As explained in footnote 3, infra., the five substantive counts of Medicare fraud charged against Adegboye appear to be this type of fraud.) And sometimes the beneficiaries would not ask for any equipment, but Ohaka would send them a power scooter anyway and then bill Medicare.

## 2. Evidence that Adegboye aided and abetted Ohaka's fraud

The specific question presented in this appeal is whether there was sufficient evidence from which a jury could find, beyond a reasonable doubt, that Adegboye knowingly and willfully aided and abetted Ohaka's fraud.[3] "To establish knowledge and willfulness, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" United States v. Franklin-El, 555 F.3d 1115, 1122 (10th Cir.

---

[3] The United States charged Adegboye with six counts. The jury acquitted Adegboye of Count 1, charging him with conspiring to commit health care fraud. The jury also convicted Adegboye on Counts 2 through 6, charging him with aiding and abetting five substantive counts of health care fraud. Briefly summarized, the evidence regarding each of those counts was as follows: Count 2 – On August 20 or 21, 2008, First Century provided Medicare beneficiary Mary Smallwood with a power scooter, but charged Medicare instead for a more expensive power wheelchair, for which Medicare reimbursed First Century $3,516. Smallwood's doctor had not prescribed either power mobility device for Smallwood, as required for Medicare reimbursement. Count 3 – First Century billed Medicare for providing Medicare beneficiary Rosa Mason, on July 15, 2008, a power wheelchair, which her physician had not prescribed, and for which Medicare reimbursed First Century $3,516. Count 4 – On July 15, 2008, First Century provided Medicare beneficiary Gladys Tatum with a power scooter, but billed Medicare instead for a more expensive power wheelchair, for which Medicare reimbursed First Century $3,516. Tatum's doctor did not prescribe either power mobility device for her. Count 5 – On August 4, 2008, First Century provided Medicare beneficiary Ms. Glendale Sanders a power scooter, but billed Medicare instead for a more expensive power wheelchair, for which Medicare reimbursed First Century $3,516. Sanders' doctor did not prescribe either device for her. Count 6 – On May 28, 2008, First Century provided Medicare beneficiary Martha Eddington a power scooter, but billed Medicare for a more expensive power wheelchair, for which Medicare reimbursed First Century $3,516. Eddington's doctor had not prescribed either device for her. Each of these beneficiaries lived in Texas or Louisiana. And in each of these cases, First Century, in billing Medicare, used the code CR, which was to be used when a Medicare beneficiary lost her medical mobility equipment due to a catastrophe such as Hurricanes Katrina, Rita, and Gustav. None of these Medicare beneficiaries, however, had been impacted by such a catastrophe. Medicare would allow a claim of $4,000-5,000 for a power wheelchair, for which Medicare would pay approximately $3,516. On the other hand, Medicare would allow a claim of approximately $2,000 for a power scooter.

7

2009) (quoting <u>Bryan v. United States</u>, 524 U.S. 184, 191-92 (1998) (internal quotation marks omitted) (emphasis omitted).) We conclude there was sufficient evidence to support Adegboye's convictions. More specifically, there was sufficient evidence from which a reasonable jury could have found the following: 1) Adegboye knew that he and Defendant Rufai were straw owners of First Century, that First Century's only business was with Medicare and its beneficiaries, and that it was actually Ohaka who was operating the company; 2) Adegboye knew that he and Rufai were straw owners <u>because</u> Ohaka wanted to hide his involvement in First Century from Medicare; 3) Adegboye knew that Medicare was reimbursing First Century hundreds of thousands of dollars for providing medical equipment to Medicare beneficiaries, and yet First Century had no inventory and no apparent means to purchase inventory; 4) Adegboye knew Medicare beneficiaries were complaining that they were not receiving equipment they had ordered from First Century; 5) when Medicare began investigating First Century and throughout Medicare's investigation, Adegboye actively tried to cover up the fraud Ohaka was committing through First Century; and 6) Adegboye profited from First Century's fraud. Considered together, this evidence was sufficient to support the jury's ultimate finding, beyond a reasonable doubt, that Adegboye knowingly and willfully aided and abetted Ohaka's fraud.

### a. Evidence that Adegboye knew that he and Rufai were straw owners of Ohaka's company, First Century, whose only business was with Medicare and its beneficiaries

We begin by considering what Adegboye knew about First Century. There was evidence from which the jury could have found, beyond a reasonable doubt, that Adegboye knew that he and Rufai were straw owners of First Century and that it was Ohaka who actually ran the company. At Ohaka's direction, Rufai incorporated First Century in September 2007, naming Adegboye as First Century's president and Rufai as its vice president. There is no indication that, in doing so, Adegboye or Rufai contributed any capital.

A month later, Adegboye, who lived in New York, visited Oklahoma City with Rufai. At that time, directed by Ohaka, Adegboye and Rufai opened bank accounts for First Century. There is no indication in the record as to who made any financial contribution to First Century, and in what amount, when these bank accounts were opened. Also at this time, Adegboye and Rufai, still directed by Ohaka, also obtained general liability insurance for First Century and began making arrangements to lease commercial space. Adegboye was also present when Ohaka hired an employee, Tracina Pratcher, to work for both Ohaka's company Vitacare and for First Century.

There was also evidence from which a jury could have found that Adegboye knew that First Century's business model was to provide only durable medical equipment that would be reimbursable by Medicare. Although by January 2008, First Century opened in a shopping center storefront, manned by one employee, Pratcher, First Century had no

9

inventory and never attempted to provide equipment in any context other than to Medicare beneficiaries. Thus, although ostensibly open in January 2008, First Century did no business until after Medicare approved it as a Medicare provider on May 20, 2008.

There was further evidence from which the jury could have found that Adegboye knew, not only that Ohaka was actually the one operating First Century, but that Ohaka was doing so in conjunction with his other companies. In addition to the evidence that Ohaka hired Pratcher to work at both Ohaka's company Vitacare and at First Century, Adegboye was present when Ohaka directed his employees to train Pratcher on how to complete the Medicare reimbursement forms. And Ohaka had his Vitacare office manager contact Adegboye several times regarding administrative details that needed to be addressed on First Century's behalf.

Further, Adegboye and Rufai were the only signatories on First Century's bank accounts, and it was only Adegboye who wrote checks on the accounts. This put Adegboye in a position to know that First Century was incurring expenses—rent, wages, office equipment, remodeling work—but was not paying those expenses, at least not out of First Century's bank account. In fact, Bank of America eventually closed First Century's initial bank account due to inactivity. Not until several months after Medicare began reimbursing First Century, in August 2008, did Adegboye pay First Century's rent, payroll and other overhead expenses from First Century's new bank accounts. And once Adegboye began paying those expenses for First Century, he also wrote checks for rent, insurance and payroll for several of Ohaka's other companies. Thus, Adegboye knew

that he and Ohaka were operating First Century in conjunction with Ohaka's other companies.

From all of this evidence, then, a jury could have found that Adegboye knew, from the outset of First Century's incorporation, that he and Rufai were straw owners of First Century, which did business only with Medicare beneficiaries, and that Adegboye knew that it was actually Joshua Ohaka who was running First Century, and running it in conjunction with his other companies.[4]

### b. Evidence that Adegboye knew that Ohaka wanted to hide from Medicare the fact that Ohaka was actually operating First Century

There was also evidence from which a reasonable juror could have found, beyond a reasonable doubt, that Adegboye knew that this business arrangement he had with Ohaka, Rufai and First Century, in which he acted as one of the straw owners of First Century, was the result of Ohaka's desire to keep from Medicare the fact that he was actually operating First Century. It was Adegboye who completed the application for First Century to become a Medicare durable medical equipment provider. In making this application, Adegboye misrepresented to Medicare that he alone owned and operated First Century. See Franklin-El, 555 F.3d at 1121, 1123 (relying in part on the defendant's misrepresentations to uphold his conviction for health care fraud).

---

[4] Neither the defense nor the dissent disputes that a jury could have found that Adegboye knew 1) that he and Rufai were straw owners and 2) that it was Ohaka who was actually running First Century.

11

More specifically, the Medicare application required Adegboye to list "[a]ll persons who have a 5 percent or greater ownership (direct or indirect) interest" in First Century; "all officers and directors" of First Century; "[a]ll managing employees," defined as "a general manager, business manager, administrator, director, or other individual who exercises operational or managerial control over, or who directly or indirectly conducts, the day-to-day operations" at First Century, whether or not that person is a First Century employee; and "[a]ll individuals with a partnership interest" in First Century. (Gov't Ex. 1F, Section 6.) In response, Adegboye falsely listed only himself, as an owner of 5% or more of First Century and as First Century's managing employee. Adegboye did not list Joshua Ohaka (or even Rufai for that matter) in any capacity. This same section of the Medicare application further inquired whether any listed person had been suspended from any federal health care program such as Medicare.

A jury could have found, then, that Adegboye misrepresented to Medicare that he, and not Ohaka, owned and operated First Century. Adegboye made this misrepresentation despite the one and one-half pages of notice to Medicare billing applicants that making false representations in the application is a crime.

The Medicare application further mandated that the applicant update any of the required information. Later, during and after the Medicare approval process, when Medicare twice directed Adegboye to revise First Century's documentation to list First Century's office manager as a managing employee, Adegboye still never mentioned Ohaka.

12

Further, when Medicare first began investigating First Century, in October 2008, it asked for a number of documents and other information that would bring First Century into compliance with Medicare's requirements. Adegboye, who assisted in providing First Century's response to Medicare's request, still did not indicate that Ohaka was involved in operating First Century. Even months after First Century ceased operating, Adegboye and his attorneys, in explaining to investigating officials why Ohaka, and not Adegboye, had possession of First Century's records, indicated only that Ohaka was Adegboye's friend and still never mentioned that Ohaka played any role in operating First Century. A jury could infer from this conduct that Adegboye, from the outset of First Century's incorporation, knowingly helped Ohaka hide from Medicare the fact that Ohaka was the one actually operating First Century.

On appeal, Adegboye points out that the documents he submitted to Medicare showed that First Century was connected with Ohaka. More specifically, as part of the application to become a Medicare provider, Adegboye provided Medicare with copies of contracts between First Century and Ohaka's company Vitacare in which Vitacare agreed to sell First Century medical equipment and to service equipment for First Century's customers. Ohaka signed one of those contracts. Nonetheless, this fact was not enough to flag, for Medicare, Ohaka's involvement in operating First Century. Nor does it absolve the misrepresentations Adegboye made in applying, on First Century's behalf, to become a Medicare provider.

13

From the evidence presented at trial, then, a jury could have found, beyond a reasonable doubt, that Adegboye knew that Ohaka did not want Medicare to know First Century was Ohaka's company and Adegboye took action to hide that fact from Medicare. From this evidence alone, a jury might be able to infer that Adegboye thus knew that Ohaka was committing Medicare fraud through First Century. But there was, in any event, still more evidence from which a jury could infer that Adegboye knew the specifics of Ohaka's health care fraud.

### c. Evidence that Adegboye knew that Medicare was reimbursing First Century for medical equipment it purportedly provided to Medicare beneficiaries, yet First Century had no inventory of durable medical equipment, nor any apparent means to purchase such inventory

Although Adegboye was the straw owner of First Century, he was not completely an absentee owner. Instead, he remained involved with the company's operation throughout its existence.[5] Two aspects of Adegboye's continued involvement with First Century, in particular, put Adegboye in a position to know about the company's fraudulent Medicare billing. First, after applying on First Century's behalf for a Medicare billing number, Adegboye remained one of First Century contacts with Medicare. And second, Adegboye (with Rufai) was the only one with control over First

---

[5] This fact provides a contrast between Adegboye, whose convictions we uphold here, and his co-defendant Rufai, whose convictions we reverse in an accompanying opinion. There was no evidence presented to the jury that Rufai's involvement in First Century continued after January or perhaps March 2008, several months before Medicare approved First Century to be a Medicare provider and, thus, several months before First Century began filing false claims for reimbursement with Medicare. Adegboye, on the other hand, remained involved with First Century throughout its existence.

Century's bank accounts. Cf. United States v. Dazey, 403 F.3d 1147, 1156, 1160 (10th Cir. 2005) (upholding fraud conviction in part because defendant controlled bank accounts of fraudulent investment company).

As the person controlling First Century's bank accounts, a jury could have found, beyond a reasonable doubt, that Adegboye knew the following: First Century never had an inventory of durable medical equipment. Nor did First Century have funds to purchase equipment.

When Rufai incorporated First Century, neither Adegboye nor Rufai contributed any capital. Nor was there any evidence that First Century obtained financing or other funding to purchase inventory from any other source. First Century's initial bank account, opened in October 2007, was eventually closed for lack of activity. And, although First Century incurred expenses during its start-up period—rent, wages, insurance, office equipment, remodeling its rented commercial space—First Century itself did not pay those expenses. Thus, in its start-up phase, First Century did not have funding to purchase inventory.

When Adegboye initially applied for First Century to be a Medicare provider, in January 2008, Adegboye did submit agreements he had signed with two of Ohaka's other companies, Optimed and Vitacare, extending credit to First Century to facilitate its

15

purchasing inventory from those two Ohaka companies.[6] But there is no indication that First Century ever purchased inventory from these two Ohaka companies.

During its pre-approval inspection of First Century, in March 2008, Medicare's inspector noted that First Century had little inventory on hand, only a manual wheelchair and a walker contributed by First Century employee Tracina Pratcher. Due to the lack of inventory, Medicare, before approving First Century to be a Medicare provider, requested additional information from First Century in order to establish that it would be able to purchase durable medical equipment to supply Medicare beneficiaries. This is because Medicare has found that one of the telltale signs of fraudulent billing is a company's lack of inventory. In response to Medicare's inquiry, Adegboye, in April 2008, provided Medicare with a letter of credit from a non-Ohaka company, Summit Durable Medical Equipment Co. There is no indication, however, that First Century purchased equipment from Summit until late September 2008.

Medicare approved First Century to be a Medicare provider on May 20, 2008. First Century immediately began submitting claims to Medicare for reimbursement, even before it reopened its bank accounts on May 30, 2008. Yet there is no indication that

---

[6] Medicare did not consider at least the letter of credit from Optimed to be valid, for purposes of First Century's application to be a Medicare provider, because Adegboye failed to provide Medicare with a copy of this agreement that included both parties' signatures.

16

First Century had any inventory, or had yet purchased medical equipment, at this point in time.[7]

Through the next four months, from May 20 to September 30, 2008, First Century billed Medicare $1.2 million for equipment provided to 150 Medicare beneficiaries. And beginning August 1, 2008, Medicare deposited over $300,000 into First Century's bank accounts. And yet there was no indication that First Century had ever purchased or paid for any durable medical equipment up until September 19, 2008. Adegboye's continued involvement with First Century and his control over First Century's bank accounts placed him in a position to know this.

Moreover, Adegboye physically visited First Century's Oklahoma City storefront sometime in September 2008. It was during this same time period that Medicare, on September 22, 2008, conducted the unannounced inspection of First Century that eventually led to that company's downfall. During that inspection, Medicare noted that First Century had almost no inventory at its office location (one manual wheelchair), the employee manning the store did not know the name of the owner and, although Adegboye, in the application he filed on First Century's behalf, indicated that First

---

[7] The record contains a receipt issued by one of Ohaka's companies, Luant and Odera, to First Century, dated May 7, 2008. That receipt indicates that First Century purchased thirty-nine power wheelchairs for a sum of $39,000, for which First Century paid cash. First Century, with Adegboye's participation, submitted this receipt to Medicare in November 2008, after Medicare began investigating, among other things, First Century's lack of inventory. A jury would not have had to credit this evidence, however, in light of contradictory evidence from First Century employees, particularly Florida Raines, that First Century had no inventory during this time period. See Dazey, 403 F.3d at 1160. Adegboye does not specifically rely upon this receipt, either at trial or on appeal.

Century would keep its customer files at the First Century storefront, there were only about ten files there, and those were incomplete and filled primarily with empty forms. From that evidence, a jury could further infer that Adegboye, because he had physically visited First Century at approximately the same time as Medicare's inspection, was aware that First Century, in September 2008, had no inventory and minimal to no customer files.

From this evidence, then, a reasonable jury could have found, beyond a reasonable doubt, that Adegboye knew that Ohaka was committing health care fraud through First Century, knew the essential nature of that fraud, and knowingly and willfully aided that fraud. There is, however, still more evidence to support Adegboye's convictions.

### d. Evidence that Adegboye knew First Century customers were complaining about not getting equipment they ordered and receiving equipment that they had not ordered

There was also some evidence that Adegboye was generally aware that First Century customers had been calling to complain about not receiving equipment they needed, and receiving equipment that they did not request. This evidence, considered with the other evidence previously mentioned, would further support the jury's finding that Adegboye knew of Ohaka's fraud and knowingly and willfully aided it.

### e. Adegboye's efforts to cover up First Century's fraud

Perhaps the most compelling evidence that Adegboye knowingly and willfully aided Ohaka's fraud was evidence that Adegboye actively tried to cover up Ohaka's fraud, once Medicare began investigating First Century, in the fall of 2008. See United

18

States v. Verners, 53 F.3d 291, 295 (10th Cir. 1995) (upholding conviction for aiding and abetting drug trafficking where, among other things, defendant actively attempted to conceal drugs). After Medicare's unannounced site visit to First Century, in September 2008, Medicare, on October 15, 2008, notified First Century that it had failed to comply, in a number of ways, with Medicare's standards applicable to durable medical equipment companies. One of the deficiencies Medicare noted was that "[t]he inventory displayed during your site inspection is not sufficient based on the amount you bill Medicare." (Gov't Ex. 1N at 2.) (Recall that First Century, between May 20 and September 30, 2008, billed Medicare for over $1.2 million for medical equipment provided for Medicare beneficiaries, yet there is no evidence that First Century purchased or otherwise acquired any inventory during this same general time period.) "In order to prove compliance with this [Medicare] standard," Medicare directed First Century "to submit all invoices for the month of June 2008, along with all credit agreements and contracts for inventory. These credit agreements and contracts must contain all the information required by [Medicare] to be considered valid." (Id.) Medicare gave First Century twenty-one days to correct this and a number of other deficiencies in its compliance with Medicare standards.

Adegboye participated in preparing First Century's response to this notice and its attempt to correct the cited deficiencies. In response to Medicare's direction to submit First Century's June 2008 invoices, First Century submitted, among other documents, an invoice from another of Ohaka's companies, Luant and Odera, indicating that on May 7, 2008, Luant and Odera sold First Century $39,000 in power wheelchairs, for which First

19

Century paid cash;[8] a list indicating that First Century had purchased over $74,000 in medical equipment from Summit between June 1 and November 7, 2008; and invoices from Summit to First Century dated between September 19 and November 6, 2008.

In addition, within one week of Medicare's October 15, 2008 notice to First Century, Adegboye wrote a check on one of First Century accounts for $115,000, payable to one of Joshua Ohaka's other companies, Providence, purportedly for the purchase of equipment. Adegboye himself then endorsed the check for Providence and deposited the check in Providence's account. While First Century did have contractual relationships and letters of credit with other companies owned and operated by Joshua Ohaka, there is no evidence that First Century had any such relationship with Ohaka's Providence. Nor is there any indication that First Century actually obtained any medical equipment from Providence. A jury could reasonably have found, beyond a reasonable doubt, that Adegboye's thus transferring over $115,000 in funds from First Century to Providence, and his participation in submitting to Medicare the wrong invoices, were efforts Adegboye undertook to cover up the health care fraud that Ohaka was committing through First Century. The jury could, thus, have found beyond a reasonable doubt that Adegboye knew of Ohaka's fraud and aided it.

---

[8] As previously mentioned, the jury would not have been required to credit the veracity of this receipt, in light of contrary testimony from Florida Raines, who was working at First Century at this time, that First Century did not purchase any medical equipment and did not have any inventory during this same time period. See Dazey, 403 F.3d at 1160.

But there is still more. In October 2008, Medicare placed First Century on prepayment status, meaning Medicare would not reimburse any more claims from First Century until First Century submitted to Medicare documentation to prove each claim submitted. When First Century could not comply with Medicare's requests for documentation of its claims, and when First Century failed to correct its noncompliance with Medicare's standards for durable medical equipment suppliers, Medicare, in January 2009, revoked First Century's Medicare provider number. At that time, Medicare again requested First Century's records. No one, including Adegboye, responded to that request for months.

In July 2009, the United States indicted Joshua Ohaka for health care fraud committed through another of his companies, Luant and Odera. In August 2009, Adegboye's attorney sent a letter notifying the Federal Bureau of Investigation ("FBI") that when FBI agents in Houston seized documents from Ohaka, they also seized First Century's records. Adegboye's attorney explained to the FBI that the reason Ohaka had First Century's records was because Adegboye had given those records to Ohaka for "safekeeping," when Adegboye was in the process of moving First Century to New York. Adegboye's attorney asked the FBI to sort through the records it had seized from Ohaka and remove First Century's records and return those to Adegboye, so he could respond to Medicare's request for his First Century records. Adegboye still did not reveal Ohaka's role in operating First Century.

Medicare apparently asked Adegboye again for First Century's records on September 16, 2009. In response, Adegboye sent a sworn affidavit to Medicare, indicating the following: He owned First Century; because of financial difficulties, Adegboye decided to move First Century from Oklahoma City to New York; for this reason, Adegboye requested that his long-time friend Ohaka box First Century's files and ship them to Adegboye in New York; because Ohaka lives in Texas, he first took First Century's records to his home in Houston; when the FBI seized Ohaka's files, agents seized First Century's files, too; although Adegboye's attorney had requested that the FBI locate First Century's files and return those to Adegboye, Adegboye had not yet heard back from the FBI. For these reasons, Adegboye asked Medicare for additional time to respond to its request for First Century's records. Adegboye, then, continued to misrepresent that he was First Century's owner and Ohaka was not involved in running the company.[9]

---

[9] This case is distinguishable from United States v. Rahseparian, 231 F.3d 1257 (10th Cir. 2000), on which the dissent relies. In Rahseparian, this Court reversed Jack Rahseparian's convictions for mail fraud and conspiracy to commit mail fraud, which were based solely on false exculpatory statements that Rahseparian made to police one and one-half years after the conclusion of a fraudulent scheme operated by others through a business with which Rahseparian was tangentially involved. Id. at 1261-64. This Court concluded that Rahseparian's after-the-fact exculpatory statements did not support the inference that he knew of the fraud at the time it was occurring. Id. at 1264. In this case, assuming Adegboye's September 2009 after-the-fraud affidavit was an exculpatory statement—if Adegboye had not known of Ohaka's fraud, a more exculpatory statement might have been that it was really Ohaka who was running First Century—there was, unlike in Rahseparian, additional evidence indicating Adegboye had been aware, the entire time, of Ohaka's scheme to defraud Medicare through First Century, and that Adegboye acted to facilitate that scheme throughout First Century's existence. Thus, a

Even more telling, however, was that, just a month before Adegboye and his attorney indicated to investigators that Ohaka was not involved in running First Century, Adegboye was taking a markedly different tone with Ohaka. On July 6, 2009, Adegboye sent Ohaka an email stating the following:

> I know you have refused to pick my calls. No PROBLEM. But the issue of First Century is a recurring decimal, not untill [sic] we sit down and tackle the issue like matured and responsible adults, we are only postponing the evil day. And i [sic] pray it does not get to that stage.
>
> Please go through the attached doc. [a collection notice indicating that Adegboye, as First Century's rent guarantor, owed over $43,000 for First Century's unpaid rent] and advise. They claim no key was giving [sic] to them., [sic] which you confirmed to be true.
>
> I will be expecting your call.

(Ex. 31.)

From this evidence, viewed together with the other evidence previously mentioned, a jury could find, beyond a reasonable doubt, that Adegboye knowingly and willfully aided Ohaka's fraud, including actively trying to cover it up.

### f. Adegboye profited from First Century's fraud

Lastly, there was evidence that Adegboye profited some from First Century's fraud. This evidence further supports the jury's finding, beyond a reasonable doubt, that Adegboye knew about Ohaka's fraud and willfully aided it. See Verners, 53 F.3d at 295 (upholding conviction for aiding and abetting drug trafficking where, among other things,

reasonable jury could have found that Adegboye's September 2009 affidavit was a continuation of his efforts undertaken throughout the fraudulent scheme to help Ohaka conceal from Medicare his involvement in First Century.

evidence indicated that defendant benefitted from drug trafficking occurring in her home).

> **g.  Viewing this evidence as a whole, a reasonable jury could have found Adegboye guilty, beyond a reasonable doubt, of knowingly and willfully aiding and abetting Ohaka's health care fraud**

Viewed in isolation, there could be innocent explanations for at least some of these circumstances, explanations which could have led a reasonable jury to find that Ohaka had duped Adegboye into unknowingly being the straw owner of a company through which Ohaka was defrauding Medicare.  But viewing the evidence as a whole, a reasonable jury could also have found that Adegboye knew all along that Ohaka was defrauding Medicare through First Century, that Adegboye knowingly and willfully associated himself with that venture, and that Adegboye took action to help the venture succeed.  That is sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Adegboye aided and abetted the five substantive fraud counts charged against him.[10]  See United States v. Phillips, 543 F.3d 1197, 1210 (10th Cir. 2008) (affirming aiding-and-abetting convictions where, "[e]ven if none of the[] facts, taken alone, would be sufficient proof to uphold [the defendant's] convictions, the combination" of facts supported by the evidence was sufficient to uphold the convictions).

---

[10] We do not read Adegboye's brief to make a separate argument that his convictions were the result of jury confusion and mistake.  But, to the extent he is making such an argument, we reject that contention as well.  In response to the jury's notes sent to the trial court during the jury's deliberations, the court gave jurors additional instructions that cleared up any confusion.

## III. CONCLUSION

The question of whether there was sufficient evidence to support the jury's finding, beyond a reasonable doubt, that Adegboye aided and abetted Ohaka's fraud is a close one. But the jury found that Adegboye knew about Ohaka's fraudulent scheme, willfully associated himself with that scheme, and acted to aid that scheme's success. Because the Government presented sufficient evidence from which a reasonable jury could have reached that finding, beyond a reasonable doubt, we AFFIRM Adegboye's convictions.

12-6035, *United States v. Adegboye*
Judge **MATHESON**, dissenting[1]

The majority correctly concludes the sufficiency of the evidence issue "is a close one." Maj. Op. at 24. The Government presented substantial evidence that Medicare fraud occurred at First Century. In the related appeal of *United States v. Rufai*, No. 12-6034, we concluded that the Government proved Mr. Ohaka knowingly committed Medicare fraud and Mr. Rufai and Mr. Adegboye performed functions at First Century that enabled Mr. Ohaka to do so. But proving what happened is not the same as proving knowledge. In *Rufai*, we held the evidence was insufficient to prove that Mr. Rufai *knowingly* aided and abetted health care fraud. Although Mr. Adegboye's case is a closer one, I would hold the same here. The Government's strong case against unindicted Medicare defrauder Mr. Ohaka should not be improperly imputed to others.

The critical issue is whether Mr. Adegboye knew about the fraudulent Medicare billing scheme at First Century and intended to defraud Medicare. At trial, the Government presented no direct evidence of Mr. Adegboye's knowledge and intent, so the issue is whether the jury could reasonably have inferred knowledge and intent beyond a reasonable doubt based upon the circumstantial evidence. *See United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000).

---

[1] This dissenting opinion incorporates by reference the discussion of facts, procedural history, and legal background from Sections I.A., I.B., II.A. (except II.A.3.), II.B., and II.C.1. from this court's unanimous opinion in the related appeal of *United States v. Rufai*, No. 12-6034.

A. *Circumstantial Evidence*

After careful review of the record, I believe the circumstantial evidence relevant to the central question of Mr. Adegboye's knowledge and intent falls into the following categories: (1) Mr. Ohaka's role in managing First Century and committing Medicare fraud; (2) Mr. Adegboye's role in setting up and maintaining First Century as a straw owner scheme; (3) Mr. Adegboye's role in securing Medicare billing approval; (4) Mr. Adegboye's role in managing First Century; and (5) Mr. Adegboye's affidavit to Medicare, submitted after Mr. Ohaka had been indicted for health care fraud in Texas, omitting Mr. Ohaka's role in First Century.[2]

1.      **Mr. Ohaka's role at First Century**

Mr. Ohaka recruited Mr. Rufai and Mr. Adegboye and directed them in setting up the company. Testimony of First Century and Vitacare employees established that Mr. Ohaka played the dominant role in First Century's management, including from May 2008 to September 2008 when First Century was submitting false bills to Medicare. Although Mr. Adegboye was present at some hiring interviews (for employees who initially worked at Mr. Ohaka's other DME companies and later at First Century), Mr. Ohaka hired the employees and decided who would work at each of the DME companies, including First Century. He decided which company would pay the employees and what

_____

[2] The majority opinion points to other evidence that it describes as evidence of a "cover up." For reasons I explain below, this evidence does not support conclusions about Mr. Adegboye's knowledge.

2

work they would do.  He also monitored whether bills had been paid and whether First Century had renewed its state permits.  He received First Century's email correspondence from the NSC and forwarded it to Mr. Adegboye.  Mr. Ohaka procured the Medicare customers, directed the employees in filling out the Medicare paperwork, and decided whether First Century or one of his other companies would submit the claims.

Mr. Ohaka's DME company employees considered him to be the manager and/or owner of First Century.  Ms. Pratcher, a Vitacare and First Century employee, testified that Messrs. Ohaka, Rufai, and Adegboye were partners in the medical supply business, including Vitacare and First Century, with Mr. Ohaka as the senior partner.  She testified that she called Mr. Ohaka with questions or problems whenever she could not get in touch with Mr. Rufai or Mr. Adegboye.  Ms. Rinker testified that she had assumed Mr. Ohaka was an owner of First Century, and because of this belief she told inspectors at the March 2008 site inspection that First Century's owner had other DME companies.  She further testified that Mr. Ohaka was her first point of contact for First Century business, that First Century and Mr. Ohaka's other businesses were run the same way, and that "[t]hings were always jumbled in between the businesses."  Trial Tr. at 227.

Mr. Ohaka called the shots at First Century.  Employees recognized him as the owner and lead manager.  It is reasonable to conclude that Mr. Adegboye regarded Mr. Ohaka similarly, that he knew Mr. Ohaka controlled what happened at the company.  Without more proof, however, it does not follow Mr. Adegboye knew everything that Mr. Ohaka did, including submission of false billing claims to Medicare.

3

## 2. **Straw owner scheme**

Mr. Adegboye's actions to set up and maintain First Century from September 2007 until January 2009 support a finding that he knew he was a straw owner. The Government presented substantial evidence that Mr. Adegboye and Mr. Rufai acted as straw owners at First Century while Mr. Ohaka managed the company behind the scenes. Mr. Adegboye's name was listed on all First Century legal documents: articles of incorporation, bank accounts, service agreements, purchase agreements, leases, insurance contracts, and Medicare application materials. Mr. Ohaka's name did not appear on any of these documents.

Although silent business partners are not uncommon in lawful enterprises, a jury could conclude that the straw owner scheme established for First Century raised a red flag to Mr. Adegboye that "*something* was amiss" at First Century. *See United States v. Lovern*, 590 F.3d 1095, 1106 (10th Cir. 2009). But knowing that something was amiss is not sufficient to conclude that Mr. Adegboye knew Mr. Ohaka was planning to or did submit false bills for Medicare reimbursement. *See id.* (reversing conviction for insufficient evidence).

## 3. **Medicare billing approval**

From January 2008 to May 2008, Mr. Adegboye participated in securing Medicare billing approval for First Century. On January 8, he signed and submitted First Century's enrollment application materials to bill Medicare. The application warned of criminal penalties for providing false information. It also warned that "payment of a claim by

4

Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions" and that the Medicare provider could not "submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Government Trial Ex. # 1F, Aplee. Suppl. Appx. at 61. In Section 6 of the application, Mr. Adegboye was required to list any individuals with a five percent or greater ownership, anyone with a partnership interest, and all managing employees.

In the initial application, Mr. Adegboye listed only himself as an owner and managing employee, which was consistent with the virtual absence of business activity at First Century during the period of pre-Medicare approval,[3] but inconsistent with Mr. Ohaka's assistance in setting up First Century. Mr. Adegboye attached to the application a letter of credit signed by Mr. Ohaka. Despite a continuing duty to update the application, he never listed Mr. Ohaka as an owner or managing employee,[4] even though a jury could reasonably infer that Mr. Adegboye knew Mr. Ohaka was managing First Century as a Medicare reimbursement business. On the enrollment materials, Mr.

---

[3] Ms. Raines testified that when she worked at First Century, before it was approved to bill Medicare, First Century only sold some scrubs. Nothing in the record indicates any other non-Medicare sales at First Century.

[4] He certified that he would notify the NSC of any changes to the information in the application within 30 days. This requirement was reinforced after the March and September 2008 site inspections, when the NSC discovered first Ms. Rinker and later Ms. Unsell at the store and informed Mr. Adegboye that he should list them as managing employees. He did so as to Ms. Rinker but listed Ms. Unsell as a "delegated official," someone with "the authority to [make] changes and updates to the" Medicare application. A delegated official must be listed elsewhere in the application as an owner or managing employee.

Adegboye directed that all email correspondence from Medicare be sent to an email address belonging to Mr. Ohaka, one that did not identify Mr. Ohaka as the recipient.

I address below whether Mr. Adegboye's handling of the Medicare application is "enough to transform the government's weak evidence . . . into proof [of knowledge] beyond a reasonable doubt." *United States v. Leos-Quijada*, 107 F.3d 786, 795 (10th Cir. 1997) (reversing for insufficient evidence).

4. **Mr. Adegboye's role at First Century**

Mr. Adegboye functioned as a straw owner and was mostly in New York and absent from the First Century office in Oklahoma. He visited occasionally and stayed in touch by telephone and email, but the record lacks evidence that he visited during the time that First Century submitted the false bills to Medicare underlying the charges in the indictment. He helped run the business by paying bills,[5] responding to issues raised by employees, and communicating with Mr. Ohaka. He also withdrew funds from the First Century bank account for personal use. In addition to submitting application paperwork to Medicare, he was responsible for submitting First Century's required filings to state authorities.[6] Ms. Rinker testified that she told Mr. Adegboye that customers complained

---

[5] Mr. Adegboye wrote checks from the First Century account for the rent of Luant, Optimed, Providence, and Vitacare and for Ms. Rinker's salary, as well as a check to Harco Heating and Air for services provided to Vitacare. Although a federal agent testified that there was no evidence First Century purchased supplies from Providence, First Century sent $56,000 via wire transfers to an account held by Providence.

[6] On May 11, 2008, Mr. Ohaka emailed Mr. Adegboye to tell him that First Century had not submitted a renewal application required by the Oklahoma state health authority.

of not receiving their equipment or receiving equipment they did not order.

The Government argues that Mr. Adegboye's First Century activities permit an inference that he knew about health care fraud because it would be unusual not to have such knowledge with his level of involvement. This argument goes too far. For example, Ms. Rinker was even more involved in running Mr. Ohaka's businesses, including First Century, and she at most had a suspicion that Mr. Ohaka was committing health care fraud. *See Rahseparian*, 231 F.3d at 1264 (noting that "suspicion is insufficient to support an inference that [an individual] intended to join" a criminal scheme).

The majority opinion emphasizes that Mr. Adegboye was told that customers had complained about not receiving equipment. The problem, however, is that the Government did not present evidence that Mr. Adegboye knew anything about the *volume* of complaints. All businesses receive at least some customer complaints, and First Century was a new business that was just establishing its operations. The Government did not show that Mr. Adegboye knew enough about the complaints to determine they were a result of fraud instead of something more benign, such as slow or disorganized operational processes.

5. **False exculpatory statements to Medicare**

First Century ceased operations in January 2009. Mr. Ohaka was indicted in July 2009. At trial the Government presented an affidavit Mr. Adegboye sent to Medicare in September 2009 that understated Mr. Ohaka's role at First Century.

After-the-fact statements to hide one's involvement in illegal activity "are

admissible to prove circumstantially consciousness of guilt or unlawful intent." *United States v. Davis*, 437 F.3d 989, 996 (10th Cir. 2006); *see also United States v. Bailey*, 327 F.3d 1130, 1140 (10th Cir. 2003) (stating that "[i]ntent may be inferred from evidence that the defendant attempted to conceal activity," from misrepresentations, and from knowingly making false statements). But such evidence has low probative value under our precedent.

Our decision in *Rahseparian*, 231 F.3d 1257, is instructive. We reversed defendant Jack Rahseparian's convictions for money laundering, mail fraud, and conspiracy to commit mail fraud because the evidence was insufficient to show criminal intent. *Id.* at 1260. The case concerned Genesis Marketing, a telemarketing business through which sons Ardie and Steve defrauded customers by failing to deliver products and prizes to them. *Id.* The customers sent checks to a mailbox. *Id.* at 1261. Mr. Rahseparian retrieved the checks and deposited them in three bank accounts, two belonging to his business, and one established in his and Steve's names. *Id.* He called Ardie almost every day to ask about how many checks to expect and the dollar amount. *Id.*

Although Mr. Rahseparian facilitated the fraud by accepting and depositing the checks, and although he had frequent contact with his son, we held this was not enough to prove intent. The Government relied primarily on false exculpatory statements Mr. Rahseparian made to law enforcement officers when they first asked him about the source of the deposited funds. *Id.* He denied knowing anything about Genesis, the

8

mailbox, and the joint bank account, and stated falsely that he cashed Genesis checks for someone for whom he did catering events. *Id.*

We said there was "no evidence [Mr. Rahseparian] was aware of the misrepresentations being made to customers, or that they were not receiving their products or prizes." *Id*. at 1263. We also said the "[f]alse exculpatory statements cannot by themselves prove the government's case." *Id.* The statements did "clearly support an inference that *by then* [he] had a suspicion of criminal activity." *Id*. at 1264. "[E]ven if [he] were suspicious of his sons' activities at the time he was depositing their checks, such a suspicion is insufficient to support an inference that he intended to join known criminal activity." *Id*.

In his affidavit to Medicare explaining that he had asked the FBI to return First Century documents to him so that he could turn them over to Medicare, Mr. Adegboye described Mr. Ohaka as a "close friend" but falsely implied Mr. Ohaka had nothing to do with First Century. By this time, Mr. Adegboye knew that Mr. Ohaka had been indicted in Texas for health care fraud and therefore had reason to conceal that he was in business with Mr. Ohaka at First Century. Does this evidence show that Mr. Adegboye knew about Mr. Ohaka's health care fraud at First Century when it occurred? *Rahseparian* teaches that false exculpatory statements made months after the alleged criminal activity ceased have limited probative value to show such knowledge.

Although we have recognized that false exculpatory statements can be evidence of consciousness of guilt, *see United States v. Caldwell*, 560 F.3d 1214, 1220 (10th Cir.

9

2009) (stating "the jury could infer Mrs. Caldwell's guilty knowledge [of events taking place over three years before] if they disbelieved her exculpatory testimony"); *Davis*, 437 F.3d at 996 (stating "false exculpatory statements [made eight days after a bank robbery to an FBI agent investigating it]. . . are admissible to prove circumstantially consciousness of guilt or unlawful intent"), such statements do not necessarily indicate knowledge of criminal activity at the time it occurred.  Rather, as we noted in *Rahseparian*, such statements may indicate no more than an after-the-fact realization that the declarant, unbeknownst to him, may have been involved earlier in illegal activity, with the accompanying desire to distance himself from suspicion as much as possible. 231 F.3d at 1264.  Mr. Adegboye's affidavit misstated Mr. Ohaka's role at First Century, but it came almost a year after the fraudulent activity had ceased.  It may show that Mr. Adegboye knew about the Medicare fraud "*by then*," *id*., and that he may have been suspicious 12 months earlier, but it is not enough to support an inference of knowledge about the fraudulent billing when it was occurring.

The majority opinion suggests that evidence in the record shows that Mr. Adegboye made efforts to "cover up" First Century's fraud.  But apart from Mr. Adegboye's Medicare affidavit discussed above, the evidence the majority cites does not demonstrate a cover up and does not go to Mr. Adegboye's knowledge.  For example, after Medicare informed First Century that its inventory was too low, Mr. Adegboye provided Medicare with invoices indicating that First Century had purchased inventory from other companies, including an invoice for $115,000 from Providence, which was

10

owned by Mr. Ohaka.  Mr. Adegboye wrote a check from First Century's account in the amount of $115,000 and deposited it directly into Providence's account.

The majority infers from this that Mr. Adegboye was covering up First Century's fraud.  This inference might be reasonable if Mr. Adegboye had not actually delivered the funds to Providence, but he did so.  The inference might also be reasonable if there was evidence Mr. Adegboye knew that Providence would not ultimately deliver the inventory, but there was no such evidence.  Mr. Adegboye was in New York, and everyone agrees he had little involvement in First Century's operations.  These facts simply do not tell us anything about Mr. Adegboye's knowledge of the fraud.

## B.  *Totality of the Circumstances*

"Sufficiency of the evidence determinations are made by assessing the totality of the circumstances in the individual case."  *Torres v. Mullin*, 317 F.3d 1145, 1164 (10th Cir. 2003).  The Government's evidence painted a picture of Mr. Adegboye as a mostly absentee participant in a business for which he allowed his name to be used as a principal but in which Mr. Ohaka was in charge and actively managed operations.  A jury could infer that Mr. Adegboye knew that (1) he was a straw owner and that Mr. Ohaka was running First Century; (2) First Century's business served only Medicare beneficiaries; (3) First Century depended on Medicare reimbursements for its revenue; (4) Medicare had found deficiencies in its operations; (5) he misrepresented the true ownership and management of First Century to Medicare when First Century was seeking and maintaining Medicare enrollment approval and (6) later when he submitted an affidavit to

11

Medicare after operations had ceased; and (7) customers had complained about not receiving equipment. The Government also presented evidence that, while Mr. Ohaka and First Century were committing Medicare fraud, Mr. Adegboye paid bills, withdrew funds, and interacted with First Century employees, Mr. Rufai, and Mr. Ohaka.[7]

Of the foregoing, the Government's case turns mostly on how Mr. Adegboye handled the application to enroll First Century as a Medicare provider. He listed only himself on the original application. Later he added Ms. Rinker and Ms. Unsell when Medicare inspectors told him to do so. Even though the enrollment form called for identification of managing employees and for updating the form, and even though Mr. Adegboye knew that Mr. Ohaka was managing First Century, Mr. Adegboye never listed Mr. Ohaka (Mr. Ohaka's name did appear on an attachment to the original application). But even if a jury could reasonably infer that Mr. Adegboye knowingly concealed Mr. Ohaka's identity from Medicare, could it further infer that Mr. Adegboye knew that Mr. Ohaka was falsely billing Medicare? The issue is very close, and the needed inference itself rests on an inference.

This is where the two key parts of the standard of review come into play. The first

_____

[7] On July 6, 2009, well after First Century's billing privileges had been revoked and just before Mr. Ohaka was indicted, Mr. Adegboye emailed Mr. Ohaka (copy to Mr. Rufai) a letter from the attorneys of First Century's landlords about debts First Century owed. Mr. Adegboye told Mr. Ohaka that they needed to "sit down and tackle the issue like matured [sic] and responsible adults," or they were "only postponing the evil day." Government Trial Ex. # 31, Aplee. Suppl. Appx. at 586. This email may indicate that Mr. Adegboye expected Mr. Ohaka to help with First Century's rent, but it does little or nothing to show that Mr. Adegboye knew of Mr. Ohaka's fraudulent billing scheme.

part asks what a reasonable jury could find about Mr. Adegboye's knowledge. A reasonable jury could find by inference that Mr. Adegboye knowingly concealed Mr. Ohaka's name on the Medicare enrollment forms. From this inference and the other evidence, a reasonable jury could suspect and also possibly infer that Mr. Adegboye knew about Mr. Ohaka's submitting false bills to Medicare. The second part of review asks whether a reasonable jury could draw this second inference beyond a reasonable doubt. An affirmative answer would establish the remaining essential element of the aiding and abetting offense—that Mr. Adegboye knew about Mr. Ohaka's false billing scheme. The Government must present substantial evidence that a jury could draw this inference from the Medicare enrollment inference. Based on review and analysis of the record, and viewed in the light most favorable to the Government, the Government fell short.

Adding the straw ownership scheme, customer complaints, and other evidence does not strengthen the Medicare application evidence as a basis to infer Mr. Adegboye's knowledge of false billing, nor does it solve the problem that his activity in the business lacked an evidentiary connection to the Medicare billing.[8] His affidavit downplaying Mr. Ohaka's role in First Century may support consciousness of Medicare fraud when he

---

[8] The customer complaint evidence is based on Ms. Rinker's testimony, which fails to establish the number and types of complaints, what Mr. Ohaka told Ms. Rinker to tell Mr. Adegboye, what she actually told him, or how the complaints differed from delivery miscues that product supply businesses typically face, especially in the starting months of a new business. And she ultimately testified that she did not tell him about any "particular" complaints. Trial Tr. at 226, 249-50, 308-09, 312.

13

signed it, but the affidavit statements were made after Mr. Adegboye knew about Mr. Ohaka's indictment for health care fraud in Texas and about one year after First Century last billed Medicare.

This case is similar to *Rahseparian*. In that case, we said the government's evidence – that Mr. Rahseparian (1) served as the contact for the Genesis Marketing mailbox, (2) conducted Genesis's banking through his own personal business accounts, thereby commingling funds and making them more difficult to trace, (3) talked daily with his son about incoming checks, (4) purchased "lead sheets" for Genesis using a cashier's check rather than a business check, and (5) made false exculpatory statements to investigators months after the alleged fraud ended – was insufficient for a reasonable jury to find that he knew Genesis was committing telemarketing fraud.

Like Mr. Rahseparian, Mr. Adegboye made false exculpatory statements to the government months (about a year) after the fraudulent activity had ended. The *Rahseparian* court said that the false exculpatory statements alone were insufficient. I would reach the same conclusion about Mr. Adegboye's affidavit, which was less incriminating than Mr. Rasheparian's statements to investigators. As in *Rahseparian*, the prosecution presented evidence in addition to Mr. Adegboye's false exculpatory statement. Although that evidence may have been a bit stronger than in *Rahseparian* – the Medicare billing approval evidence in particular – it was, as in *Rahseparian*, insufficient to infer knowledge of the alleged billing fraud beyond a reasonable doubt.

14

Mr. Ohaka recruited Mr. Adegboye and Mr. Rufai to be the front men for his fraudulent business. It is possible that Mr. Adegboye was duped into thinking he had been given a legitimate business opportunity and later may have suspected the business was illicit in some way, especially after Mr. Ohaka had been indicted. On the other hand, as the indictment alleged, he may have been aware of Mr. Ohaka's billing scheme and First Century's fraudulent Medicare claims at the time of the criminal activity. But if the latter is true, the Government did not prove it beyond a reasonable doubt, directly or circumstantially. Mindful of the standard of review that applies to a sufficiency of the evidence challenge, I would reverse Mr. Adegboye's conviction for aiding and abetting health care fraud.[9]

---

[9] After arguing that the evidence was insufficient to support his conviction, Mr. Adegboye contends that the only explanation for his aiding and abetting convictions and his acquittal for conspiracy is that the jury was confused and mistaken on the law. This argument appears to attempt to reinforce Mr. Adegboye's insufficiency of the evidence argument rather than stand as a separate issue. In particular, he argues that the jury held him strictly liable for the actions of First Century because he was responsible for its dealings as its owner and because he signed the Medicare applications. Because I would hold that the evidence was insufficient, the court need not reach this argument.

15