**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 7 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JALAL RAHSEPARIAN, also known
as Jack Rahseparian,

      Defendant-Appellant.

No. 99-6031

---

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 98-CR-70-A)

---

Lawrence S. Robbins (Lily Fu Swenson, with him on the briefs), of Mayer, Brown
& Platt, Washington, D.C., for Defendant-Appellant.

Barbara E. Poarch, Assistant United States Attorney (Patrick M. Ryan, United
States Attorney, with her on the briefs), Oklahoma City, Oklahoma, for Plaintiff-
Appellee.

---

Before **SEYMOUR**, Chief Judge, **TACHA** and **BRISCOE**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

After a joint jury trial, co-defendants Ardashir (aka Ardie), Daryoush (aka Steve), and Jalal (aka Jack) Rahseparian were convicted of conspiracy to commit mail fraud, mail fraud, and money laundering.  We affirmed the convictions of Steve and Ardie in the companion opinion filed simultaneously herewith.  *See United States v. Rahseparian*, _ F.3d _, Nos. 99-6050, 99-6052 (10th Cir. filed Nov. 7, 2000).  Jack contends the evidence was insufficient to support his convictions.  Because we agree, we need not consider the other issues he raises on appeal.

# I

## BACKGROUND

Ardie and Steve Rahseparian are the sons of Jack Rahseparian.  At the time of the conduct for which they were charged, Steve resided in Altoona, Pennsylvania, Ardie resided in Fort Smith, Arkansas, and Jack resided and worked in Shawnee, Oklahoma.  The government argued successfully to the jury that Ardie and Steve Rahseparian formed Genesis Marketing, a telemarketing company, through which they and their father conspired to commit and did commit mail fraud from May 1994 to May 1995.  The government further successfully argued that Ardie, Steve, and Jack Rahseparian laundered the

proceeds from the telemarketing scheme through Jack's business checking accounts.

Submitting no evidence, the Rahseparians' defense relied on the theory that Ardie and Steve never intended to commit fraud but rather intended only to run a legitimate telemarketing business. Jack Rahseparian contends he was only doing minimal banking for his sons with no knowledge of any illegal activity, and he thus did not have the requisite intent to conspire with his sons to commit mail fraud. He further argues that because he did not know Genesis was committing mail fraud, he could not be found guilty of laundering its proceeds.

At trial, the government's case regarding Jack's intent was, as is typical with such criminal ventures, entirely circumstantial. Brad Russell, the company's only employee other than the Rahseparians themselves, testified on behalf of the government. Mr. Russell was a personal friend of Ardie. The two worked out of Ardie's apartment in Fort Smith as the sole telemarketers for Genesis Marketing. Mr. Russell testified that he and Ardie would entice customers over the telephone to buy products, such as water purifiers and "Say No to Drugs" kits, at highly inflated prices in exchange for a guaranteed valuable prize. Those customers never received their promised prizes, however, and many did not even receive their purchased product.

Mr. Russell's testimony established that each day after he and Ardie made the solicitations, they would forward information to Steve Rahseparian regarding the customers' names, the product purchased and the amount paid, and which cheaper prize had been mentioned to the customer. Steve was supposed to fill the orders and ship the cheap prize from Pennsylvania to the customers. Mr. Russell testified that, after a period, he and Ardie began receiving complaints from customers that they had not received their products or their prizes, and that these complaints were reported to Steve. Although some customers ultimately received their purchased products, none received their promised prizes.

Mr. Russell further testified that he and Ardie directed customers to send their checks for the purchase price via Federal Express to a mailbox located in Shawnee, Oklahoma. This mailbox was provided by a commercial vendor called "The Copy Stop."[1] The mailbox was set up in the name "Steven Woods/Genesis Marketing." The Copy Stop's records indicated the local contact for the box was a person named "Jack," with a local telephone number of Jack Rahseparian's business.

The government established that the checks were deposited into three separate bank accounts: a business checking account at American National Bank

---

[1]The record is not clear whether the business name was "The Copy Shop," or "The Copy Stop," and the parties refer to this business under both names.

in Shawnee, Oklahoma, established in the name of Jack Rahseparian's business; a business checking account at MidFirst Bank in Shawnee, Oklahoma, also established in the name of Jack's business; and a joint checking account at the MidFirst Bank established in the names of Jack and Steve Rahseparian. In addition, Mr. Russell testified that Jack called Ardie every day or every other day to find out "how many checks to expect and how much they were." Rec., vol. II at 546. Mr. Russell testified that Jack picked up those checks from the mailbox and deposited them into his accounts.

To bolster their case regarding Jack's criminal intent, the government offered evidence of his false exculpatory statements. After officers were alerted to the criminal activity of Genesis Marketing, they investigated the bank accounts connected to the deposit of defrauded customers' payments, and discovered Jack Rahseparian's business accounts in Shawnee. Two officers approached Jack in November 1996 and inquired into the source of those deposited funds. Jack first denied knowing anything about Genesis Marketing, and then fabricated a story that he had cashed the checks payable to Genesis Marketing for a man for whom he held catering events. He even described the man as a white male, approximately 25 to 28 years old. He also denied knowing anything about the mailbox at The Copy Stop or that he had ever retrieved mail from it. He further denied setting up the joint checking account for himself and Steve at MidFirst,

and claimed he did not make the first deposits to open that account and did not know where those deposits came from.

After hearing all of this evidence and reviewing the supporting documentary evidence, the jury found Jack guilty of conspiracy to commit mail fraud, mail fraud, and money laundering. He moved for a judgment of acquittal, arguing there was insufficient evidence that he conspired to or intended to commit mail fraud, or that he intended to commit money laundering. The district court denied the motion, pointing to the evidence that Jack was the contact person for the mailbox, did Genesis Marketing's banking, and made false exculpatory statements when questioned by the FBI. The court held this evidence was sufficient for the jury to conclude Jack agreed to and participated in the scheme with Ardie and Steve to deceive Genesis Marketing customers and to launder the proceeds.

## II

### INSUFFICIENCY OF EVIDENCE

On appeal, Jack contends the government failed to present sufficient evidence of his intent to commit these crimes. Conspiracy, mail fraud, and money laundering are specific intent crimes. *See United States v. Boyd*, 149 F.3d 1062, 1067 (10th Cir. 1998) (money laundering requires specific intent to launder

proceeds from a known unlawful activity); *United States v. Smith*, 133 F.3d 737, 742 (10th Cir. 1997) (mail fraud required specific intent to defraud); *United States v. Blair*, 54 F.3d 639, 642 (10th Cir. 1995) (conspiracy requires specific intent to further the unlawful activity which is the object of the conspiracy). The government was thus required to prove Jack specifically intended to defraud Genesis' customers, that he made an agreement to that end, and that he laundered the proceeds knowing they were obtained through illegal activity.

Sufficiency of evidence is a question of law that we review de novo. *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997), *cert. denied*, 118 S. Ct. 1856 (1998). To determine whether evidence is sufficient to uphold a conviction, "we examine, in a light most favorable to the government, all of the evidence together with the reasonable inferences to be drawn therefrom and ask whether any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Aruntunoff*, 1 F.3d 1112, 1116 (10th Cir. 1993). Moreover, we "accept the jury's resolution of conflicting evidence . . . . As long as the possible inferences are reasonable, it was for the jury, not the court, to determine what may have occurred." *United States v. Grissom*, 44 F.3d 1507, 1510 (10th Cir. 1995). We will not uphold a conviction, however, that was obtained by nothing more than "piling inference upon inference," *United States v.*

*Fox*, 902 F.2d 1508, 1513 (10th Cir. 1990), or where the evidence raises no more "than a mere suspicion of guilt," *Smith*, 133 F.3d at 742.

### A.    Mail Fraud and Conspiracy

To convict Jack of mail fraud, the government was required to prove (1) the devising of a scheme or artifice either to defraud or for obtaining money by means of false or fraudulent pretenses, representations, or promises; (2) the specific intent to defraud; and (3) use of the United States mails to execute the scheme. *United States v. Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995); 18 U.S.C. § 1341.  To convict him of conspiracy, the government had to establish: (1) the defendant's agreement with another person to violate the law; (2) his knowledge of the essential objective of the conspiracy; (3) his knowing and voluntary involvement; and (4) interdependence among the alleged coconspirators. *See United States v. Edwards*, 69 F.3d 419, 430 (10th Cir. 1995); 18 U.S.C. § 371.

Jack argues the evidence is insufficient to show he knew Genesis Marketing was defrauding its customers, an essential element of both the mail fraud and the conspiracy alleged in this case.  Without such knowledge, Jack could not have agreed with his sons to defraud Genesis' customers, nor could he knowingly further such activity. *See, e.g., United States v. Austin*, 786 F.2d 986, 988 (10th

Cir. 1986) (knowledge of conspiracy's objective is necessary to show requisite criminal intent); *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975) ("At a minimum however, it must be shown that [a defendant] has knowledge of the conspiracy's illegal purpose when he performs acts which further that illicit purpose."). Thus, as Jack correctly points out, his conspiracy and mail fraud convictions turn on whether the jury could reasonably infer beyond a reasonable doubt that he knew Genesis Marketing was an unlawful business.[2] After reviewing all of the evidence presented, we hold it could not.

A defendant's knowledge of the purpose of the criminal conspiracy must be shown by "clear, unequivocal evidence." *See Austin*, 786 F.2d at 988. The only evidence regarding Jack's knowledge of the mail fraud was entirely circumstantial. While we have repeatedly held that circumstantial evidence may support a jury's reasonable inference of guilty knowledge by the defendant, *see, e.g., United States v. Bell*, 154 F.3d 1205, 1208 (10th Cir. 1998), an inference is only reasonable where there exists a "probability that the conclusion flows from

---

[2]Citing to our opinion in *Lewis v. United States*, 420 F.2d 1089, 1089-90 (10th Cir. 1970), Jack argues that evidence which is consistent with both innocence and guilt is insufficient to uphold a conviction. We have expressly rejected the *Lewis* standard, however, adopting "a single test that applies in criminal cases," which is whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *See United States v. Price*, 795 F.2d 61, 62-63 (10th Cir. 1986); *United States v. Hooks*, 780 F.2d 1526, 1530-31 (10th Cir. 1986) (pointing out unfortunate use of language in *Lewis* in conflict with Supreme Court decisions and prior Tenth Circuit law).

the proven facts." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995) (citation omitted). An inference is unreasonable where the jury engaged "in a degree of speculation and conjecture that renders its findings a guess or mere possibility." *Id.*

The government points to the following evidence to support the inference made by the jury that Jack knew Genesis Marketing was an unlawful enterprise: Jack was the contact person for the mailbox, which was unrelated to Jack or his business ventures; Jack conducted all of Genesis Marketing's banking through his own personal business accounts, which resulted in a commingling of funds to the extent that tracing the flow was difficult or impossible; Jack had daily conversations with Ardie regarding the incoming checks; Jack purchased "lead sheets" for Genesis Marketing using a cashier's check rather than a business check; and Jack made false exculpatory statements regarding the source of deposits of Genesis Marketing's funds.

None of this evidence, even when considered in a light most favorable to the government, supports beyond a reasonable doubt an inference that Jack knew Genesis Marketing was unlawful. The first four pieces of evidence which the government cites in no way show that Jack knew Genesis Marketing was not a legitimate telemarketing business. At most, they show that the sole owner of a private business was doing his sons' banking for them through his own personal

"d/b/a" account.  Importantly, although Mr. Russell testified he overheard the daily conversations between Ardie and Jack, he did not testify he ever heard anything incriminating said with respect to Jack.  There is no evidence Jack was aware of the misrepresentations being made to customers, or that they were not receiving their products or promised prizes.  Regarding the purchase of "lead sheets," the jury heard testimony that lead sheets are a completely legal and common means for telemarketing businesses to identify promising potential customers. The government argues Jack's purchasing of these lead sheets with a cashier's check obtained with cash taken from Jack and Steve's joint checking account was incriminating in some way.  To infer from this that Jack knew Genesis was defrauding its customers requires a degree of speculation and conjecture that makes an inference unreasonable.  *See Jones*, 44 F.3d at 865.

Although this evidence may raise a suspicion of guilt, that alone is insufficient to support Jack's convictions.  *See Smith*, 133 F.3d at 742.  *See also Austin*, 786 F.2d at 988 ("evidence that only places the defendant in a climate of activity that reeks of something foul" is insufficient to show his criminal knowledge) (quoting *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir. 1983)).  In short, we are persuaded Jack's participation in the business affairs of Genesis Marketing was "so minimal that the jury cannot be permitted to infer that [he] harbored criminal intent to defraud."  *United States v. Wrehe*, 628 F.2d 1079,

1085 (8th Cir. 1980) (reversing convictions for conspiracy, mail fraud, and wire fraud).

In upholding Jack's convictions, the district court recognized that without Jack's false exculpatory statements regarding the source of the Genesis Marketing deposits, the above cited evidence was insufficient to sustain his convictions. *See rec.*, vol. III at 720 ("Certainly, a scienter cannot be inferred logically just from the fact that he is a family member of the other two and had some peripheral engagement in their business. There's nothing inherently criminal about depositing checks into an account, that's only money laundering if there's knowledge of the illegal source."). The district court held that because of Jack's false statements, however, the jury's inference that he knew Genesis was a fraud was a reasonable one. *See id.*

False exculpatory statements cannot by themselves prove the government's case. While "[f]alse exculpatory statements made by a defendant are admissible to prove circumstantially *consciousness of guilt* . . . [s]uch statements cannot be considered by the jury as *direct evidence of guilt*." *United States v. Zang*, 703 F.2d 1186, 1191 (10th Cir. 1982) (emphasis added). In practical terms, "a defendant's attempt to fabricate evidence after an alleged violation of the law is not sufficient to establish guilt." *Id. See also United States v, Teffera*, 985 F.2d 1082, 1087 (D.C. Cir. 1993) (false exculpatory statements that are the sole

-12-

incriminating evidence are insufficient to show defendant knew of illegal activities); *United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir. 1989).

Courts have limited the probative value of false exculpatory statements because the most probable and obvious inference to be drawn therefrom is that the defendant "surmised he was implicated in some sort of criminal activity." *Nusraty*, 867 F.2d at 765. Jack's false statements were made in November of 1996, a year and a half after Genesis Marketing ceased doing business in May of 1995. The false statements clearly support an inference that *by then* Jack had a suspicion of criminality. At a minimum, the officers' presence and inquiries alerted Jack that his sons were caught up in a criminal investigation, from which he would understandably wish to protect them. Moreover, even if Jack were suspicious of his sons' activities at the time he was depositing their checks, such a suspicion is insufficient to support an inference that he intended to join known criminal activity. *See, e.g., Jones*, 44 F.3d at 866 ("Mere suspicion of illegal activity . . . is insufficient to prove participation in a conspiracy."); *Austin*, 786 F.2d at 989 (defendant's admitted suspicion of something illegal was insufficient to show his knowledge of the conspiracy's illegal purpose).

Although knowledge of the mail fraud need not be proven by direct evidence, it cannot be established by evidence which merely raises a suspicion, or by piling inference upon inference. We are convinced that is what happened here.

-13-

A jury may draw an inference only where that inference can be made beyond a reasonable doubt. *See Grissom*, 44 F.3d at 1510. Because this is not such a case, we hold the evidence was insufficient to support Jack Rahseparian's convictions for conspiracy to commit mail fraud and mail fraud.

**B.     *Money Laundering***

To convict Jack of money laundering, the government was required to prove that (1) he engaged in a financial transaction, (2) knowing the property involved in the transaction represented the proceeds of unlawful activity, (3) the property involved was in fact the proceeds of unlawful activity, and (4) he knew the transaction was designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." *United States v. Contreras*, 108 F.3d 1255, 1264 (10th Cir. 1997) (quoting 18 U.S.C. § 1956(a)(1)(B)(I)). The money laundering statute itself does not require the government to prove that a defendant knew what specific illegal activity generated the money. *See* 18 U.S.C. 1956(c)(1) (stating that "the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony"). However, in

-14-

this case mail fraud was the only "unlawful activity" charged in the indictment, argued by the government, and required by the jury instructions to support the money laundering counts. Under these circumstances, as discussed below, Jack's money laundering conviction must be reversed as well.

As a general rule there are two knowledge inquiries in money laundering cases: whether the defendant knew about the illegal nature of the funds, and whether the defendant knew that the financial transactions were intended to conceal the illegal source of the funds. *See, e.g., Contreras*, 108 F.3d at 1264; *United States v. Campbell*, 977 F.2d 854, 857 (4th Cir. 1992). Where, as here, the defendant is not the source of the illegal funds, the inquiry into whether he knew of an intent to conceal occurs only after it has been established that he knew the funds were illegal. *See Campbell*, 977 F.2d at 858 (where defendant was not part of underlying illegal activity, "the knowledge components of the money laundering statute collapse into a single inquiry: did [the defendant] know that [the] funds were derived from an illegal source?"). As a non-participant in the mail fraud or conspiracy, the mere fact that Jack was handling his sons' banking cannot evidence any "intent to conceal" money from an illegal source if he had no knowledge the money was illegally obtained in the first place. Moreover, because the indictment in this case specifically charged that the unlawful activity underlying the money laundering count was mail fraud, the government was

-15-

obligated to prove not only that Jack knew the money was obtained illegally, but that it was obtained by mail fraud.

The problem for the government in this case is best illustrated by comparing the statute with the indictment, a copy of which was provided to the jury. Section 1956(a)(1)(B)(I) provides:

> (a)(1) Whoever, *knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity*, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> > (A) . . . .
> >
> > (B) knowing that the transaction is designed in whole or in part –
> >
> > > (I) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; shall be sentenced to a fine of not more than $500,000 . . . or imprisonment for not more than twenty years, or both.
> >
> > (c) As used in this section –
> >
> > > (1) *the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from **some form, though not necessarily which form,** of activity that constitutes a felony* under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7).

(Emphasis added). The indictment, on the other hand, charged as follows:

> On or about the dates listed below, in the Western District of

Oklahoma, and elsewhere, the defendants,

> JALAL RAHSEPARIAN, a/k/a Jack Rahseparian,
> DARYOUSH RAHSEPARIAN, a/k/a Steve Rahseparian, and
> ARDASHIR RAHSEPARIAN, a/k/a Ardie Rahseparian,

did knowingly and willfully conduct and cause to be conducted financial transactions affecting interstate commerce, as follows:

      (a)    the defendants deposited and caused to be deposited funds received from victims of telemarketing into American National Bank, Shawnee, Oklahoma, Account No. 393-1771;

      (b)    these deposited funds *represented the proceeds of a specified unlawful activity*;

      (c)    *that being* the sending of checks and money orders solicited through *a telemarketing scheme* via commercial interstate carriers *as set forth in counts 2 through 6 of this Indictment,* and

      (d)    *knowing that the deposits that occurred on the dates listed below were designed in whole and in part to conceal and disguise* the nature, location, source, ownership and control of the proceeds of *said specified unlawful activity.*

App., vol. I at 31-32 (emphasis added).  The indictment thus charged that defendants deposited the funds received from the telemarketing scheme "(d) knowing that the deposits . . . were designed . . . to conceal and disguise . . . the proceeds of *said specified unlawful activity*."  Notably, the indictment did *not* include section 1956(c)(1), which defines the term "knowing that the property . . . represents the proceeds of some form of unlawful activity" to mean "that the person knew the property . . . represented proceeds from *some form, though not necessary which form, of activity that constitutes a felony*."  (Emphasis added).  The indictment clearly charged Jack with knowing that the proceeds came from

-17-

the specified unlawful activity of telemarketing fraud, and just as clearly did not charge him merely with knowing that the funds were derived illegally. "[I]t is a fundamental precept of federal constitutional law that a 'court cannot permit a defendant to be tried on charges that are not made in the indictment.'" *Hunter v. New Mexico*, 916 F.2d 595, 598 (10th Cir. 1990) (per curiam) (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)).

In addition, the government's theory at trial was that Jack knew the proceeds were from the telemarketing scheme, not from some unspecified form of felonious conduct. Indeed, the government argued that Jack actually committed and conspired to commit mail fraud by means of the telemarketing scheme. The government did not theorize that Jack might have known about some other illegal activity, and presented no evidence that any other illegal activity had occurred.

Finally, the jury was instructed it had to find Jack had knowledge of the mail fraud in order to find him guilty of money laundering. Instruction 39 quoted from the statute only in part, leaving out the definition in section 1956(c)(1):

> Section 1956(a)(1)(B)(I) of Title 18 of the United States Code, provides in part that:
>
> > Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> > . . . .

(B)(I) knowing that the transaction is designed in whole or in part – to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . is guilty of an offense against the United States.

*You are instructed that mail fraud is a specified unlawful activity under this statute.*

*Id.* at 86 (emphasis added).

Instruction 40 then stated the elements the government had to prove for the jury to convict Jack of money laundering:

FIRST: That the defendant knowingly conducted, or attempted to conduct, a "financial transaction" as hereafter defined;
SECOND: That the defendant knew that the funds or property involved in the financial transaction represented the proceeds of some form of unlawful activity;
THIRD: That the funds or property involved in the financial transaction did in fact represent the proceeds of " *specified unlawful activity" – in this case the proceeds of mail fraud in connection with a telemarketing scheme as alleged in the indictment* ;
FOURTH: That the defendant engaged in the financial transaction *knowing that the transaction was designed in whole or in part to conceal* or disguise the nature, location, source, ownership and control of *the proceeds of the said specified unlawful activity* .

*Id.* at 87 (emphasis added). This instruction informed the jury it had to find Jack knew the unlawful transaction was designed to conceal the proceeds of "the said specified unlawful activity," *i.e.,* the telemarketing scheme.

Finally, Instruction 41 stated:

The term "proceeds of unlawful activity" as used in the preceding statute means any property constituting or derived from proceeds obtained

from a criminal offense. *The government alleges that the specified unlawful activity required by the statute was the alleged mail fraud charged in Counts 2 through 6 of the indictment.*

*Id.* at 88 (emphasis added).

The record thus contains no allegation, evidence, or finding that Jack's money laundering conviction was based on any unlawful activity other than mail fraud. In view of our conclusion that the evidence is insufficient to sustain Jack's convictions for mail fraud and conspiracy to commit mail fraud, his money laundering conviction cannot stand. The government simply did not meet the burden of proof on the money laundering counts imposed by the indictment and instructions.

In sum, we **REVERSE** Jack's convictions for mail fraud, conspiracy, and money laundering.