FILED
**United States Court of Appeals**
**Tenth Circuit**

**April 11, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JAMIS MELWOOD JOHNSON,

    Defendant - Appellant.

No. 13-4090

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:09-CR-00133-CW-PMW-3)**
_____

Marcus R. Mumford, Mumford PC, Salt Lake City, Utah, for Defendant-Appellant.

Adam Elggren, Assistant United States Attorney, Office of the United States Attorney, Salt Lake City, Utah (John W. Huber, United States Attorney, Office of the United States Attorney, Salt Lake City, Utah, on the briefs), for Plaintiff-Appellee.
_____

Before **HARTZ**, **GORSUCH**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Jamis Melwood Johnson was convicted of seven counts of mail fraud, 18 U.S.C. § 1341; nine counts of wire fraud, 18 U.S.C. § 1343; one count of conspiracy to commit mail fraud and wire fraud, 18 U.S.C. § 1349; and ten counts of money laundering, 18 U.S.C. § 1956(a)(1)(A)(i). He appeals the denial of a motion

for a new trial, challenges the sufficiency of the evidence, and alleges several instances of prosecutorial misconduct. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.      Facts

On March 18, 2009, a grand jury indicted Johnson on 38 counts of wire fraud, mail fraud, money laundering, and conspiracy to commit wire fraud and mail fraud. It also indicted two co-defendants, Ronald Haycock and Lyle Smith. The charges resulted from a scheme that ran from 2005 to 2007 involving loans based on artificially inflated values of residential properties. The defendants would find sellers whose homes had been on the market for a long time and convince them to enter into a joint-venture agreement (JVA) that would fix the price that the seller would be paid as the asking price of the home. The defendants would then recruit straw buyers with high credit scores, who for a fee would fill out and sign loan applications. The defendants would then alter the information before giving it to the lender by changing the amounts for income, assets, down payment, etc., as well as by stating that the buyers had large cash deposits with Johnson's company, Johnson & Associates. Johnson would then authorize, approve, and verify that the buyers had deposited cash assets with Johnson & Associates, a process known as verification of deposit (VOD), even though he knew that the accounts did not exist. Johnson disputes that he provided the VODs.

After the lending institutions had approved the fraudulent loan applications, the defendants then would mail closing documents to the mortgage companies.

2

Johnson and the other defendants did not inform the mortgage companies that the buyers were straw buyers, that the buyers had not used any of their own money for the earnest money or down payment, that the buyers would not be living in the home, that the buyers had received a fee to act as straw buyers, or that the loan applications contained fraudulent financial numbers. Once the original mortgage was paid off with the loan funds at the price agreed to in the JVA (the asking price of the home), the remaining money went to the straw buyers, Johnson, and the other defendants.

At trial, the government produced evidence of a number of transactions following the same pattern. One of the transactions, the Military Way transaction, was the sale of Johnson's home. According to the government, this transaction was unlike the others because Johnson carried out the entire transaction himself, angering his co-conspirators because they were cut out of the transaction and its proceeds. Johnson claimed to be an attorney with a New York City address (Johnson had been disbarred in Utah and Idaho in 2002 and had not practiced in New York in years) and telephone number (which, when called, rang at Johnson's Salt Lake City office) and used a straw buyer who had been involved in other purchases in the scheme. In fact, the New York City address was an apartment where Johnson's son lived.

For the sale of his own residence on Military Way, Johnson created a false real-estate contract and filled out a false loan application, misrepresenting whether there was a cash deposit and whether the buyer intended to occupy the house, inflating the buyer's monthly income, and noting a nonexistent cash deposit account of more than $350,000 with Johnson & Associates. Johnson also gave an underwriter

3

a verbal verification of the cash deposit account for $359,739.07. In short, Johnson executed the sale of the Military Way property much like the other transactions involved in the scheme.

Before trial, Johnson moved for a bill of particulars. The government opposed the motion because it claimed that it had already provided Johnson with over 99% of available discovery. The government stated that it had an "open file" discovery policy. Suppl. vol. 1 at 75. The district court found that policy sufficient and denied the motion. Later, the government turned over a large amount of additional evidence. Johnson asserts that the government provided 11,000 additional pages and 11 additional witness summaries. Johnson has not informed us of how much this additional discovery was relative to the amount already turned over, or when the government acquired this additional discovery material.

Johnson was released pending trial. As a condition of his release, he was not to procure a new passport (his current passport had expired). The government sought revocation of Johnson's release status after learning that Johnson had applied for an expedited passport through a passport company and planned to travel outside of the United States beginning December 8, 2010, according to an itinerary submitted with the expedited passport application. Part of the government's concern was that it had set a plea-negotiation deadline of December 7, 2010. At a hearing, the magistrate judge found that Johnson had violated the passport condition and ordered him into custody. The judge advised the U.S. Marshal that Johnson is legally blind and that the Marshals needed to ensure that Johnson had access to counsel.

4

Johnson appealed his detention to the district court. The government's response included an itinerary from the passport company, showing that Johnson had planned to travel to Mexico on December 8, 2010. Based on the evidence presented, the district court found that Johnson was a flight risk. Johnson claimed the passport company had fabricated the itinerary "for administrative purposes" so he could get the passport sooner. Suppl. vol. 2 at 129. He maintained (and continues to maintain on this appeal) that he had no actual plans to leave the country. Rather, Johnson asserted that a former client approached Johnson to accompany him on a cruise in January "as his companion and aide" because the former client was "in poor health." *Id.* at 127. Johnson had accompanied the former client on an earlier cruise. Johnson told the district court that the cruise left from San Diego, but he did not reveal the destinations or route. Johnson stated that he told his former client about the need for permission to travel and that his former client had offered to pay for both the cruise and the application.

Johnson also mentioned the problems that he was having with the visual-aid equipment at the jail. The "large" apparatus could not be operated in Johnson's cell due to insufficient electrical outlets, so to use the equipment Johnson had to go to the lockdown unit. *Id.* at 107. Johnson did not clarify why that arrangement was insufficient beyond noting that it "would essentially be solitary confinement." *Id.* at 108. The district court noted the issues Johnson had been having with the visual-aid equipment at the jail and asked defense counsel to work with the Marshals to solve them.

During trial, Johnson filed a motion for review, claiming that his lack of access to visual-aid assistance for the month of trial—at first nonexistent and later sporadic—had hindered his ability to assist in his defense. At a hearing on Johnson's continued detention, held outside of the jury's presence, the prosecutor argued for continued detention based on Johnson's supposed failure to surrender his passport. In fact, the prosecutor's recollection was faulty: because Johnson's passport had already expired by the time he was indicted, the court had not required that he surrender it. After hearing the evidence and Johnson's account of his hindered assistance to his counsel, the district court released him for the rest of trial.[1]

On March 18, 2011, the jury convicted Johnson of seven counts of mail fraud, 18 U.S.C. § 1341; nine counts of wire fraud, 18 U.S.C. § 1343; one count of conspiracy to commit mail fraud and wire fraud, 18 U.S.C. § 1349; and ten counts of money laundering, 18 U.S.C. § 1956(a)(1)(A)(i). Before the case was submitted to the jury, Johnson had moved for a judgment of acquittal under Fed. R. Crim. P. 29, which the district court deferred until after the jury's verdict. On March 21, 2011, the district court denied Johnson's Rule 29 motion.

On March 25, 2011, one week before Johnson's motion for a new trial under Fed R. Crim. P. 33 was due, Johnson moved for an extension, which the district court granted. On April 15, 2011, Johnson timely filed his new-trial motion. On April 25,

---

[1] At oral argument, counsel stated that he did not believe that Johnson and his attorney conferred by telephone. He did not clarify when asked whether Johnson and his attorney could have conferred by telephone.

2011, the government sought and obtained an extension of time to respond to the Rule 33 motion.

On April 29, 2011, Johnson's first retained counsel moved to withdraw, and on May 3, 2011, the district court granted the motion. On May 12, 2011, Johnson retained his second counsel. On May 18, 2011, Johnson's second counsel moved for an extension of time to file a substitute Rule 33 motion. On June 1, 2011, the district court granted an extension until September 20, 2011, for Johnson to file another Rule 33 motion. On September 22, 2011, two days *after the deadline*, Johnson's second counsel filed a second motion for an extension. The district court again accommodated Johnson, extending the deadline until November 4, 2011. On November 2, 2011, still unprepared, Johnson's second counsel sought another extension. Again, the district court granted an extension, this time until November 21, 2011. On November 18, 2011, Johnson filed a pro se motion for yet another extension (his fourth). At a hearing on the pro se motion, the magistrate judge ordered that by January 27, 2012, Johnson's counsel file a list of possible new-trial issues after Johnson had communicated them to his counsel. On January 20, 2012, Johnson's second counsel filed a fifth motion for an extension, which the district court granted, extending the deadline to March 21, 2012. On March 21, 2012, Johnson filed multiple pro se motions, leading his second counsel to move to withdraw on March 29, 2012. On April 12, 2012, the district court granted the motion.

On April 20, 2012, the district court appointed Johnson his third and current counsel. The district court gave third counsel until July 9, 2012, to file any motions.

7

On July 2, 2012, Johnson's third counsel filed a stipulated motion for an extension of time to file a new trial motion (Johnson's sixth extension). Again, the district court accommodated Johnson, extending the deadline until July 23, 2012, but cautioning Johnson that the court would grant no further extensions. Even so, on July 23, 2012, Johnson's third counsel filed another motion for an extension (Johnson's seventh extension), to which the United States objected. Despite its earlier words, the district court again relented, this time extending the deadline to August 7, 2012. On August 7, 2012, Johnson's third counsel filed another motion for an extension (Johnson's eighth extension), and the United States again objected. Once again, the district court granted the motion, setting a new deadline of August 30, 2012, and cautioning again that it would grant no further extensions. On September 7, 2012, a week after Johnson's last deadline, the United States filed a motion to strike any late new-trial motions.

On September 11, 2012, Johnson saw fit to file—finally—his second motion for a new trial, raising multiple issues not argued in the first motion. In total, Johnson was granted eight motions for an extension of time: second counsel received four, Johnson received one pro se, and third counsel received three. Although the new motion was untimely, at a hearing on February 13, 2013, the district court allowed Johnson to argue issues that he raised in the second motion. Ultimately, however, the district court ruled that the second motion was untimely and restricted its analysis to the issues raised in Johnson's first motion filed almost eighteen months earlier. The

8

first motion was denied. After the district court denied Johnson's first new-trial motion, Johnson appealed.

## II. Discussion

### A. Waiver of Claims in Johnson's Second Rule 33 Motion for a New Trial

Under Fed. R. Crim. P. 33(b), a motion for a new trial on any grounds other than newly discovered evidence must be filed within 14 days of the guilty verdict. The defendant may seek extensions under Fed. R. Crim. P. 45. The court may consider an untimely motion if the untimeliness is due to excusable neglect. Fed. R. Crim. P. 45(b)(1)(B). We review the district court's decision not to consider an untimely motion for a new trial for an abuse of discretion. *United States v. Custodio*, 141 F.3d 965, 966 (10th Cir. 1998).

Unquestionably, Johnson's second motion for a new trial, filed on September 11, 2012, was untimely. We conclude that the district court did not abuse its discretion by refusing to consider the second motion. On appeal, Johnson does not even argue that his untimeliness arose from excusable neglect. After almost eighteen months of extensions to file the second new-trial motion, Johnson's third counsel filed the motion eleven days late. He did so in the face of the district court's twice telling him that it would give no more extensions and the government's objections. Unlike the first new-trial motion, which was based on a single allegedly improper comment during the government's closing argument, his second new-trial motion raised four new claims: (1) prosecutorial misconduct at the revocation-of-release hearing, (2) prosecutorial misconduct at the hearing on the bill of particulars, (3)

9

inability to assist with his defense, and (4) insufficiency of evidence under Rule 33. Because Johnson's second new-trial motion was untimely, we conclude that the district court did not abuse its discretion in concluding that Johnson had waived these additional arguments.

Johnson argues that in his second motion he merely raised new arguments rather than new claims. He is correct that "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) (quotation marks omitted). But in *Lebron*, the district court had addressed the claim. *See id.* ("Our practice 'permit[s] review of an issue not pressed so long as it has been passed upon . . . .'" (alteration in original) (quoting *United States v. Williams*, 504 U.S. 36, 41 (1992))).[2] Here, although Johnson briefed and argued the new claims raised in his untimely second new-trial motion, the district court never ruled on those claims. Although Johnson can quote a few statements by the district court about the new claims, the district court certainly did not rule on those claims. The district court noted that it "did consider those arguments" but "ultimately concluded that the United States was right. That those arguments were not properly considered because they were untimely and they

---

[2] Black's Law Dictionary defines "pass" as "To pronounce or render an opinion, ruling, sentence, or judgment." *Pass*, Black's Law Dictionary (10th ed. 2014). Therefore to "pass upon" an issue, the district court had to actually rule on the issue, not merely consider it. Black's defines "render" as: "(Of a judge) to deliver formally <render a judgment>," so "opinion" here means a formal opinion, not merely the judge's informal opinions at the hearing. *Render*, Black's Law Dictionary (10th ed. 2014).

exceeded the grounds that were stated in the initial motion for a new trial." R. vol. 3 at 2875. The district court declined to pass on the issue, stating that "even if [it] were to consider those new arguments, [it] believe[d] that they would not change the outcome of the court's decision." *Id.* Unquestionably, the district court struck as untimely the second new-trial motion.

Additionally, we conclude that Johnson's untimely second new-trial motion set out new claims, not merely new arguments supporting earlier-made, timely claims. The prosecutorial-misconduct claims are connected only because they could fall under a broad umbrella of "prosecutorial-misconduct claims." Simply identifying in a timely new-trial motion a specific prosecutorial-misconduct claim for a comment during closing argument hardly gives license to then months later add at will any other unrelated prosecutorial-misconduct claims. Instead, it gives license to add additional reasons why the earlier-referenced closing-argument statement was prosecutorial misconduct. Revocation of release, candor to the court, and whether Johnson had adequate access to visual aids are new claims and therefore we will not consider them. Johnson's arguments from his Rule 29 motion for judgment of acquittal, however, survive.

**B.     Johnson's Rule 33 Motion Based On Prosecutorial Misconduct**

As discussed above, Johnson's first new-trial motion under Rule 33, filed on April 15, 2011, was timely. In that motion, Johnson made just one claim—that the prosecutor made an improper comment during closing argument:

[Johnson] immediately, however, broke that promise to Mr. Flahaut. He never made a single payment. The only payments that were made were payments that were made on his behalf by Mr. Haycock, the Great Oz. That terminated fairly shortly afterward and Mr. Johnson tonight will be sleeping in 1408 Military Way despite breaking all those promises to Mr. Flahaut, despite leaving him out in the cold. *Mr. Flahaut is still trying to figure out a way to resolve this situation all while Mr. Johnson and his family refuse to let any potential buyers in the home so that Mr. Flahaut can try to sell the property that has been—*

R. vol. 3 at 2050–51 (emphasis added). Johnson then objected, and the district court sustained the objection. Defense counsel did not request a curative instruction. The district court later clarified that it had sustained the objection only to the last sentence. *See id.* ("And that is where the objection came, and that last sentence was the sentence that I found objectionable and sustained the objection.").

We review the rest of the statement for plain error because it was not objected to at trial. *United States v. Toro-Palaez*, 107 F.3d 819, 828 (10th Cir. 1997). Plain error requires (1) an error (2) that is plain (3) which affects substantial rights, and (4) which "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Vann*, 776 F.3d 746, 759 (10th Cir. 2015) (quotation marks omitted). "When evaluating allegedly inappropriate remarks of counsel for plain error, we must view the remarks in the context of the entire trial." *Id.* at 760 (quoting *United States v. Lopez-Medina*, 596 F.3d 716, 738 (10th Cir. 2010)).

The statement that "Mr. Johnson tonight will be sleeping in 1408 Military Way despite breaking all those promises to Mr. Flahaut, despite leaving him out in the cold", R. vol. 3 at 2050, was based on evidence presented at trial and it was not error. At trial, witnesses had testified that Johnson was living in the home. *Cf. United States*

12

*v. Oles*, 994 F.2d 1519, 1524 (10th Cir. 1993) (holding that a reference even to facts not in evidence is not necessarily plain error). The statement came during the prosecutor's discussion of Johnson's attitude toward his victims as evidence of knowledge. The remark does not rise to the level of plain error.

## C.    Sufficiency of the Evidence

We review de novo a district court's denial of a motion for judgment of acquittal based, as here, on a claim of insufficient evidence to support a jury's verdict. *United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008). We view the evidence in the light most favorable to the government to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *United States v. Hutchinson*, 573 F.3d 1011, 1033 (10th Cir. 2009). But this court does not decide credibility issues or reweigh the evidence. *Id.* We "accept the jury's resolution of conflicting evidence. . . . As long as the possible inferences are reasonable, it was for the jury, not the court, to determine what may have occurred." *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000) (quoting *United States v. Grissom*, 44 F.3d 1507, 1510 (10th Cir. 1995)). The only question is "whether the government's evidence, credited as true, suffices to establish the elements of the crime." *Hutchinson*, 573 F.3d at 1033.

On March 21, 2011, the district court denied Johnson's motion for acquittal under Fed. R. Crim. P. 29(a), reasoning that "[a]fter due consideration of the evidence and the parties' oral arguments, the court concludes there was sufficient evidence to support the jury's verdict." R. vol. 1 at 23. Later, during sentencing, the

13

district court reaffirmed that position, commenting that "the jury, if it believed the witnesses, had sufficient evidence to find that Mr. Johnson was guilty, and I have sustained that verdict on that." R. vol. 3 at 2708. Even so, the district court almost immediately afterward said that it "d[id] not find that the government's principal witnesses were credible." *Id.* at 2709. In this regard, the district court noted that those witnesses "had motive, they had self-interest, and they were given a great deal in terms of their own conduct in order to testify against Mr. Johnson." *Id.* In particular, the district court took issue with "testimony of primarily Mr. Haycock and Mr. Smith that Mr. Johnson was the person who conceived of this scheme." *Id.* at 2710. But the district court acknowledged Johnson's involvement in the Military Way transaction, finding it reasonable to infer that at closing "he looked at the false loan documents and should have known that the information that Mr. Flahaut was submitting was false." *Id.* at 2713.

By Johnson's telling, the district court's sentencing comments meant that it would not have convicted Johnson of any charges. We think this reads too much into the comments. Johnson's role could be limited to something less than the architect of the entire scheme but still provide sufficient conduct to sustain a guilty verdict against him. And even had the district court gone so far as to say it disbelieved the government's witnesses to an extent *exonerating* Johnson, that would not mean that the district court erred by denying the motion for acquittal. The district court is the finder of fact for purposes of sentencing. *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th Cir. 2003). But, as the district court correctly said, that would not

14

give it power to undo the jury's credibility determinations in convicting Johnson of his offenses. Rather, the district court is required to accept the jury's interpretation of conflicting evidence. Thus, Johnson's argument that the district court erred by allowing the jury to credit the government's witnesses in weighing guilt lacks merit. Additionally, any disagreements about the facts, including whether Johnson issued the VODs, must be resolved in favor of the jury's verdict. *United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir. 1999).

Johnson also argues that the government did not provide sufficient evidence of knowledge of the purpose of the criminal conspiracy or of the mail- or wire-fraud charges. Johnson leans heavily on *Rahseparian* to say that the government failed to provide "clear, unequivocal evidence" of his knowledge. *Rahseparian*, 231 F.3d at 1262. In *Rahseparian*, unlike here, the government presented no direct evidence that the defendant knew about the purpose of the conspiracy. *See id.* at 1262–63. Instead, it relied on evidence that he controlled a mailbox, commingled funds, conversed daily about checks, used a cashier's check instead of a business check, and gave false exculpatory statements. This raised only a suspicion of guilt. *Id.* at 1263.

Here, in contrast, the jury heard sufficient evidence to convict. Johnson challenges the knowledge element of each crime. Although he can point to evidence supporting his view, the government can point to contrary evidence supporting its assertion that Johnson had knowledge. The jury was fully justified in crediting the government's testimony and evidence. On appeal, we do not reweigh the evidence, but instead review the evidence in the light most favorable to the government. *United*

15

*States v. Sparks*, 791 F.3d 1188, 1190–91 (10th Cir. 2015). The testimony of Haycock, Smith, and Bradley Kitchen, another government witness, that Johnson knew the scheme was illegal, especially when combined with Johnson's drawing up JVAs to be used in the fraud and his verbally verifying deposit amounts was more than sufficient to establish knowledge. It is true that the district court found that *for the purposes of sentencing* there was no evidence that Johnson knew and agreed that the JVAs would be used to secure fraudulent loans. That does not, however, alter our deference to the jury's verdict.

Indeed, the jury had ample evidence to find that Johnson knew full well about the scheme. For instance, Johnson carried out the Military Way transaction alone, angering his co-conspirators. *See* R. vol. 3 at 521 (testimony that Haycock had said "there would be consequences"); *id.* at 1318 (Haycock saying "I was quite upset at the time"). To carry out the same scheme, even without a JVA, Johnson must have known the workings of the underlying illegal scheme. If his only role was issuing the VODs and he had no knowledge of the rest of the operation, we do not see a reasonable situation where he could have carried out an almost identical scheme on his own, even using one of the straw buyers that the scheme itself had used previously.

The government's evidence of interdependence was also sufficient. "Interdependence is present if 'the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole.'" *United States v. Wardell*, 591 F.3d 1279, 1291 (10th Cir. 2009) (quoting

16

*United States v. Horn*, 946 F.2d 738, 740–41 (10th Cir. 1991)). Johnson claims that any allegation of his involvement was limited to the VODs and that no evidence proves his involvement in recruiting straw buyers or in falsifying loan documents. But Johnson misconstrues conspiracy law—if he knowingly became a part of the conspiracy, it doesn't matter if he wasn't involved in every part of the process. Johnson's involvement with the VODs was also sufficient to show interdependence because the VOD was integral for the straw buyers to obtain loans. *See* R. vol. 3 at 494, 653–54. By verifying the buyers' large deposits with Johnson & Associates that the jury could rightfully find he knew did not exist, Johnson obviously increased the likelihood that these fraudulent loans would be issued, thus "facilitat[ing] the venture as a whole." *Wardell*, 591 F.3d at 1291.

Johnson did not challenge the money-laundering conviction below so we review for plain error. *United States v. Rufai*, 732 F.3d 1175, 1189 (10th Cir. 2013). Plain error requires (1) an error (2) that is plain (3) which affects substantial rights and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Vann*, 776 F.3d at 759. Plain-error review and sufficiency-of-the-evidence review cover some common ground because a successful sufficiency challenge almost always meets the first three factors of plain error and will generally meet the fourth. *Rufai*, 732 F.3d at 1189.

Johnson argues that the government never proved that he received income from the transactions and therefore failed to prove money laundering. The elements of money laundering are that (1) the defendant conducted or attempted to conduct a

17

financial transaction (2) which the defendant knew involved the proceeds of unlawful activity (3) with the intent to promote or further the unlawful activity. *United States v. Torres*, 53 F.3d 1129, 1136 (10th Cir. 1995). Johnson argues that the government needed to "prove that Johnson conducted a financial transaction with the proceeds of mail or wire fraud." Appellant's Reply Br. at 22. Johnson is mistaken—the government had to prove that the financial transaction "involve[d] the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1) (2012). The government did not have to prove that Johnson actually received funds from the scheme. Additionally, there was conflicting evidence about whether Johnson in fact received funds, and we must interpret the facts in the light most favorable to the jury's verdict. Johnson has failed to show plain error in his money-laundering conviction.

## III.    Conclusion

We affirm the district court.